**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

**COLUMBIA DIVISION**

| | |
|---|---|
| JOYCE FARR CHEEKS, as Personal Representative of the Estate of LEROY H. WILKS, JR., Deceased, | 3:26-cv-2698-JFA<br>Civil Action No. _____ |
| Plaintiff, | **COMPLAINT**<br>(Non-Jury Action —<br>Federal Tort Claims Act) |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

Plaintiff Joyce Farr Cheeks, as the duly appointed Personal Representative of the Estate of Leroy H. Wilks, Jr., by and through her undersigned counsel, and complaining of Defendant United States of America, brings this action for wrongful death and survival and for the personal injuries inflicted upon Leroy H. Wilks, Jr.—a 100% service-connected, honorably discharged United States military veteran—by Defendant and/or its agents, servants, physicians, nurses, therapists, dietary staff, monitors, supervisors, administrators, and other staff, and would respectfully show unto this Court as follows:

**PARTIES**

*Plaintiff:*

1

1.      Plaintiff Joyce Farr Cheeks is a citizen and resident of Richland County, South Carolina, and is the duly appointed Personal Representative of the Estate of Leroy H. Wilks, Jr. (hereinafter "Decedent" or "Mr. Wilks").

2.      She brings this action on behalf of Decedent's estate for damages recoverable pursuant to S.C. Code Ann. § 15-5-90 (survival), and for damages recoverable by Decedent's statutory beneficiary pursuant to S.C. Code Ann. § 15-51-10, et seq. (wrongful death).

3.      Decedent's sole statutory wrongful-death beneficiary is his son, Leroy H. Wilks, III.

4.      This action is prosecuted by the Personal Representative for the benefit of that statutory beneficiary and for the benefit of Decedent's estate.

5.      Plaintiff has complied with the provisions of 28 U.S.C. § 2675(a) by presenting an administrative tort claim (Standard Form 95) to the Department of Veterans Affairs prior to the commencement of this action.

### *Defendant:*

6.      Defendant United States of America (hereinafter "Defendant" or "USA") is a proper party to this action, which is brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq. (the "FTCA").

7.      The USA, by and through the United States Department of Veterans Affairs (the "V.A.") and its medical facility, the William Jennings Bryan Dorn Veterans Affairs Medical Center, and in particular its Community Living Center (hereinafter "Dorn" or the "Dorn CLC") located in Columbia, South Carolina, is sued for the actions and inactions of its attending physicians, nurses, speech-language pathologists, dietary and food-service staff, nursing assistants, meal monitors, supervisors, administrators, and other staff.

8.      These persons are the agents, servants, and employees of the USA and Dorn, and all acts or omissions complained of herein, performed by said agents, servants, and employees, occurred during the course and scope of such agency and/or employment and are therefore imputed to Defendant USA.

9.      Defendant's negligent acts, omissions, and liability include those of its agents, principals, employees, and/or servants, both directly and vicariously, pursuant to principles of non-delegable duty, corporate liability, apparent authority, agency, ostensible agency, and/or respondeat superior.

10.     Pursuant to 28 U.S.C. § 2679(b)(1), the exclusive remedy for the negligent or wrongful acts or omissions of the individual V.A. and Dorn employees acting within the scope of their employment is an action against the United States; the individual employees themselves may *not* be named as defendants.

11.     Plaintiff therefore identifies the negligent employees and decision-makers herein by their roles and functions—rather than as named co-defendants—solely to particularize the

multiple, separate, and independent breaches of duty that combined and concurred to cause Mr. Wilks's death, and to demonstrate that the conduct of Defendant's several distinct providers and institutional components supports both an uncapped recovery and, in the alternative, the stacking of statutory caps as set forth below.

## JURISDICTION AND VENUE

12.    This Court has subject-matter jurisdiction pursuant to its federal-question jurisdiction as provided by 28 U.S.C. §§ 1331 and 1346, and in compliance with 28 U.S.C. §§ 1346(b) and 2671–2680, commonly known as the Federal Tort Claims Act, which vests exclusive subject-matter jurisdiction over Federal Tort Claims litigation in the United States District Courts.

13.    Venue is proper in this District and Division pursuant to 28 U.S.C. § 1402(b), because the act and omissions complained of occurred in this District and because Plaintiff resides in this District.

14.    A substantial part of the events and omissions giving rise to these claims occurred at the Dorn CLC in Columbia, South Carolina.

15.    Plaintiff submitted an administrative claim (Standard Form 95) to the appropriate claims officer of the Department of Veterans Affairs.

16.    An agent of the USA has informed counsel for Decedent that the parties are at an impasse and Plaintiff takes that as a formal denial of claim.

17.    More than six (6) months have passed since the presentment of that claim without final disposition, and Plaintiff hereby exercises the option afforded by 28 U.S.C. § 2675(a) to deem the claim denied; alternatively, this action is timely filed following the V.A.'s final denial of the claim.

## CAPS AND DAMAGES

18.    Under the FTCA, the United States is liable for the tortious acts and omissions of its employees "in the same manner and to the same extent as a private individual under like circumstances," and the law of the place where the act or omission occurred—here, the substantive tort law of South Carolina—governs the existence and measure of Defendant's liability. 28 U.S.C. §§ 1346(b)(1), 2674.

19.    The United States is not liable for punitive damages or for pre-judgment interest. 28 U.S.C. § 2674.

20.    Because South Carolina supplies the rule of decision, the South Carolina Noneconomic Damage Awards Act of 2005, S.C. Code Ann. § 15-32-210, et seq., is the predicate statute governing any limitation on noneconomic damages in this action.

21.    That Act, and not any federal cap, defines the outer boundaries of noneconomic recovery against Defendant, because the FTCA itself contains no damages cap.

3

22.     Under S.C. Code Ann. § 15-32-220, the limit on civil liability for noneconomic damages in a medical-malpractice action is a base amount of $350,000 (2005 dollars) per claimant against a single health-care provider or institution, and a base aggregate amount of $1,050,000 (2005 dollars) per claimant where more than one health-care provider or institution is liable.

23.     These figures are adjusted annually for inflation by the South Carolina Revenue and Fiscal Affairs Office. For 2026, the inflation-adjusted limit is approximately **$580,461** against a single provider or institution and approximately **$1,741,383** in the aggregate where multiple providers or institutions are liable.

24.     **No cap applies to Plaintiff's claims.** By its express terms, the noneconomic-damages limitation of S.C. Code Ann. § 15-32-220 does *not* apply where the trier of fact finds that the defendant was grossly negligent, willful, wanton, or reckless, or where the defendant engaged in fraud, misrepresentation, or the alteration or destruction of records. S.C. Code Ann. § 15-32-220(E).

25.     As set forth throughout this Complaint, the conduct of Defendant's agents and employees was grossly negligent and reckless.

26.     Accordingly, the statutory cap is inapplicable and the noneconomic damages recoverable by Plaintiff are unlimited.

27.     In addition, there is no statutory cap of any kind on economic damages in South Carolina, and there is no cap on damages arising from ordinary, non-medical, ministerial, administrative, or supervisory negligence.

28.     To the extent Plaintiff's claims sound in ordinary negligence rather than medical malpractice, no noneconomic-damages cap applies.

29.     In the further alternative, and only if any cap were found to apply, the caps in this case must be stacked.

30.     The United States acted here through multiple, distinct health-care providers and institutional components, each of which owed independent duties to Mr. Wilks and each of which committed a separate and independent breach constituting a separate occurrence of negligence within the meaning of S.C. Code Ann. § 15-32-220(A)–(B).

31.     Although the FTCA prohibits naming these individuals as co-defendants, see 28 U.S.C. § 2679(b)(1), it does not collapse their separate breaches into a single occurrence for purposes of South Carolina's damages limitation.

32.     The separate providers, institutional components, and occurrences of negligence include, without limitation: (1) the treating physician who entered and was responsible for ensuring an enforceable mandatory supervision protocol; (2) the speech-language pathology service that evaluated Mr. Wilks and prescribed the dysphagia and visualization protocol; (3) the nursing and direct-care service responsible for implementing the physician-ordered supervision at every meal; (4) the meal monitor present on June 29, 2023, who failed to attend to Mr. Wilks, failed to timely recognize his choking, and failed to summon emergency help; (5) the dietary and food-service

4

component that prepared and served french fries in violation of Mr. Wilks's prescribed therapeutic diet; and (6) the facility's administration and clinical leadership responsible for staffing, policies, procedures, and protocols designed to keep residents such as Mr. Wilks from dying.

33. These are more than three separate and distinct occurrences and providers, each of which independently supports the application of a separate statutory cap.

34. Accordingly, even if any noneconomic-damages cap were held to apply, which Plaintiff denies, the proper measure of the cap is the stacked aggregate limit (approximately $1,741,383 for 2026), and not a single-provider limit, with the precise number of applicable caps to be determined by the Court.

35. There are no caps whatsoever, however, if Plaintiff proves that Defendant's conduct, was non-medical in nature or the conduct of its agents and employees was grossly negligent or reckless, as alleged herein.

## BACKGROUND AND FACTS

36. Plaintiff brings this action because of the negligence, recklessness, and gross negligence of the United States of America and its agents and employees, which caused the preventable, wrongful death of Leroy H. Wilks, Jr., by asphyxiation while choking on food he should never have been served and while eating without the supervision a physician had ordered to keep him alive.

37. The claims herein arise out of the substandard medical, nursing, therapeutic, dietary, supervisory, ministerial, administrative, and non-medical care provided to veteran Leroy H. Wilks, Jr., by the agents, servants, and employees of the Dorn CLC in Columbia, South Carolina.

38. Leroy H. Wilks, Jr. was a 71-year-old honorably discharged United States military veteran.

39. He was born on May 14, 1952, and died on June 29, 2023.

40. Mr. Wilks's care and custody were entrusted to the Dorn CLC for the long-term residential treatment of his service-connected schizoaffective disorder.

41. He had been a resident of the Dorn CLC for well over a decade, beginning on or about 2006, and continuing through the date of his death.

42. Mr. Wilks had been rated 100% disabled by the V.A. for loss of use of both feet and for left knee replacement under 38 U.S.C. § 1151—meaning that the very injuries that confined him to a wheelchair, and to the Dorn CLC, were caused by prior V.A.-administered medical treatment.

43. His 100% evaluation was effective January 18, 2012. Mr. Wilks was wheelchair-bound and wholly dependent upon the staff of the Dorn CLC for his daily care, safety, and survival.

44. Mr. Wilks's past medical history included schizoaffective disorder, chronic pain syndrome, and type II diabetes mellitus,

45. Mr. Wilks's schizoaffective disorder and his antipsychotic-medication regimen placed him at a significantly elevated risk of fatal choking, beyond the risk associated with dysphagia alone.

46. The peer-reviewed medical literature establishes that patients with schizophrenia-spectrum disorders who are maintained on antipsychotic medications face a substantially elevated risk of fatal choking through two well-recognized mechanisms: tachyphagia (abnormally rapid eating) and antipsychotic-induced impairment of the swallowing reflex.

47. Mr. Wilks's records documented exactly this risk profile, including a "known tendency to attempt rapid intake with large boluses."

48. On August 23, 2022, Mr. Wilks suffered a choking episode while eating dinner.

49. Medical attention to Mr. Wilks choking episode transpired almost immediately.

50. Shortly after nurses at Dorn CLC cleared his airway, Mr. Wilks was transported to the closest emergency department.

51. Following this episode, speech therapy recommended an "easy to chew" diet.

52. On October 11, 2022, Mr. Wilks suffered a second choking episode—this time while eating roast beef—which required staff to manually remove the roast beef from the back of his throat.

53. It was noted that Mr. Wilks had a "known tendency to attempt rapid intake w/large boluses."

54. He was evaluated again by speech-language pathology and was identified as having "chronic behavioral feeding disorder, chronic oral stage dysphagia."

55. In response to this documented, recurring, life-threatening risk, the speech-language pathologist recommended frequent visualization of the oral cavity during and after Mr. Wilks's meals.

56. A treating physician reviewed and adopted that clinical recommendation and entered it into Mr. Wilks's medical chart as a physician's order and a mandatory component of his plan of care.

57. This physician-ordered supervision protocol required that a staff member be present and attentive during Mr. Wilks's meals to monitor him for choking and aspiration, and it remained in effect through the date of Mr. Wilks's death on June 29, 2023.

58. That physician's order existed for one reason, and one reason only: to prevent Leroy Wilks from choking to death.

6

59. Defendant's agents and employees knew this.

60. They documented it.

61. They then violated it.

62. On June 29, 2023, during a pre-Fourth-of-July communal celebration in a common area of the Dorn CLC, precisely the type of unstructured, high-distraction setting that elevates a known choking risk, Mr. Wilks was supplied with a plate of french fries and permitted to eat without the attentive supervision his physician had ordered.

63. French fries do not constitute an "easy to chew" diet under the International Dysphagia Diet Standardization Initiative (IDDSI), the internationally recognized framework for therapeutic diet textures.

64. Because of their variable texture, their tendency to form cohesive boluses, and their resistance to controlled mastication, french fries are contraindicated for patients with oral-stage dysphagia and behavioral feeding disorders such as those documented in Mr. Wilks's records.

65. The provision of french fries to Mr. Wilks on June 29, 2023, was itself a violation of his prescribed therapeutic diet and a departure from the standard of care, independent of and in addition to the supervision failure.

66. The facility's own surveillance system recorded the events that followed.

67. The video shows Mr. Wilks eating rapidly and without adequate attention from the nearby staff member.

68. The staff member present, who, upon information and belief, was physically present but completely inattentive, including, upon information and belief, attending to a cell phone, failed to monitor Mr. Wilks as required by the physician's order.

69. The video documents Mr. Wilks placing food into his mouth, stopping, struggling, and restarting, with the cycle repeating at diminishing intervals.

70. He then stopped moving.

71. Only thereafter was he noted to be choking by the nearby staff member, and attempts were made to relieve his choking.

72. Eventually he was moved out of his wheelchair to the ground, CPR was initiated, and he was pronounced dead, covered by a white sheet.

73. An autopsy performed on June 30, 2023, found Mr. Wilks's cause of death to be asphyxiation due to choking on french fries.

74. Mr. Wilks consciously experienced his own death.

75.     Based on the video evidence, Mr. Wilks was last seen moving at approximately the 36:12 mark and was lowered to the floor at approximately the 40:50 mark—a period of approximately four minutes and thirty-eight seconds (4:38) during which the video documents his active distress.

76.     Based upon the well-established physiology of complete airway obstruction, loss of consciousness from cerebral hypoxia typically occurs only after four to six minutes of complete obstruction.

77.     Mr. Wilks was therefore conscious and aware of his distress throughout the majority of the 4:38 period documented in the video.

78.     The suffering Mr. Wilks endured during this period was not merely uncomfortable or painful in the ordinary sense.

79.     Complete airway obstruction produces a specific and extreme physiological response known as air hunger, an overwhelming, involuntary, and unsatisfiable drive to breathe that the peer-reviewed medical literature characterizes as among the most distressing sensations a human being can experience, and that activates the same brain pathways implicated in post-traumatic stress disorder, anxiety, and depression.

80.     In addition to the air-hunger response, Mr. Wilks experienced the physical sensation of the food bolus obstructing his airway, the involuntary gagging and retching associated with attempts to dislodge it, the inability to call out for help, and the full cognitive awareness that he was dying and that no one was helping him.

81.     Mr. Wilks's suffering was further intensified by informed terror. Having survived two prior near-fatal choking episodes, he was not experiencing a novel sensation; he knew exactly what was happening to him, he had lived through it before, and he knew that without intervention he would die, all while the person Defendant stationed beside him to prevent this exact outcome failed to act.

82.     Mr. Wilks's death was preventable.

83.     As a skilled-nursing facility receiving federal funds, the Dorn CLC was subject to the federal regulations set forth at 42 C.F.R. Part 483, promulgated under the Omnibus Budget Reconciliation Act of 1987.

84.     The conduct described herein, more likely than not, violated FTAG 689 (requiring a facility to keep its environment safe and free of hazards) and FTAG 692 (requiring the provision of appropriate nutrition and hydration, including an appropriate therapeutic diet).

85.     Neither of these federal requirements was followed in the care of Mr. Wilks, which led to his choking and death on June 29, 2023.

86.     Although the individual employees of Defendant may not be named as co-defendants under the FTCA, see 28 U.S.C. § 2679(b)(1), the negligence that killed Mr. Wilks was

the product of multiple, separate failures by multiple, separate persons and decision-makers, each acting within the scope of his or her employment, including without limitation the following:

a.      The treating physician (identified herein as the "Doe Physician") who entered Mr. Wilks's mandatory meal-supervision order and who was responsible for ensuring that the order was reduced to an enforceable, staffed protocol, but whose order was permitted to go unenforced on June 29, 2023;

b.      The speech-language pathologist (the "Doe SLP") who evaluated Mr. Wilks, diagnosed his chronic oral-stage dysphagia and behavioral feeding disorder, and prescribed the dietary-texture and oral-visualization protocol that was thereafter disregarded;

c.      The nursing and direct-care staff (the "Doe Nursing Staff") responsible for implementing the physician's supervision order at every meal and for ensuring that Mr. Wilks—a known, repeat, near-fatal choking victim—was never left to eat unsupervised;

d.      The staff member present at Mr. Wilks's table on June 29, 2023 (the "Doe Monitor"), who sat beside him yet failed to attend to him, failed to recognize his choking in a timely manner, failed to call 911, and failed to timely initiate airway-clearance maneuvers, while he asphyxiated within arm's reach;

e.      The dietary and food-service staff (the "Doe Dietary Staff") who prepared, plated, and served Mr. Wilks a contraindicated plate of french fries in direct violation of his prescribed therapeutic diet; and

f.      The facility's administrators and clinical leadership (the "Doe Administrators") responsible for adopting, implementing, staffing, and enforcing the policies, procedures, and protocols—including those required by 42 C.F.R. Part 483—necessary to keep residents such as Mr. Wilks from dying, and who failed to do so notwithstanding a prior, substantially similar asphyxiation death at this same facility.

87.      Each of the foregoing persons and decision-makers owed Mr. Wilks an independent duty of care; each separately breached that duty; and the breaches combined and concurred to cause Mr. Wilks's death.

88.      The conduct of the Doe Monitor, the Doe Dietary Staff, and the institutional failures of the Doe Administrators reflect the wholesale abandonment of a non-delegable supervision mandate and an elemental failure of human attention and basic safety conduct that is grossly negligent and reckless.

89.      The negligence, gross negligence and recklessness of the of the Doe Monitor, the Doe Dietary Staff, and the institutional failures of the Doe Administrators do not involve clinical judgment, the practice of medicine and are non-medical in nature and have no caps.

90.      The negligent, grossly negligent, and reckless acts and omissions of Defendant's agents, servants, and employees, as described above, directly and proximately caused Mr. Wilks to be served a contraindicated food, to be left unsupervised in violation of a physician's order, to choke, to be denied timely emergency intervention, and ultimately to be asphyxiated and killed.

9

91.     The Plaintiff files a contemporaneous affidavit to support any type of medical breach in this case.

92.     The affidavit also addresses non-medical care breaches which does not require an affidavit

## FOR A FIRST CAUSE OF ACTION
### (Wrongful Death — Negligence, Gross Negligence, and Recklessness)

93.     Plaintiff hereby incorporates by reference and re-alleges every allegation in every Paragraph of this Complaint as if fully set forth herein.

94.     Defendant, through its agents and/or employees, undertook the duty to render medical, nursing, therapeutic, dietary, supervisory, and custodial care to Mr. Wilks in accordance with prevailing and acceptable professional standards of care in the national community.

95.     Notwithstanding said undertaking, and while Mr. Wilks was under the care of Defendant's agents and/or employees, Defendant departed from prevailing and acceptable standards of care in the treatment and supervision of Mr. Wilks and was thereby negligent, careless, grossly negligent, reckless, and in violation of the duties owed to him. Defendant is liable for one or more of the following acts of omission or commission, any or all of which are departures from the prevailing and acceptable standards of care:

a.     In medical staff failing to comply with the physician-ordered supervision and oral-visualization protocol during Mr. Wilks's meals;

b.     In failing to timely initiate basic airway-clearance maneuvers, including the Heimlich maneuver;

c.     In failing to have nurses clear his airway as had been done on previous choking episodes;

d.     In failing to appreciate the significantly elevated choking risk associated with Mr. Wilks's schizoaffective disorder and antipsychotic-medication regimen, including tachyphagia and impairment of the swallowing reflex;

e.     In such other particulars as will be determined through discovery and the trial of this case;

all of which combined and concurred to proximately cause the wrongful death of Leroy H. Wilks, Jr.

96.     As a direct and proximate result of the negligence, carelessness, gross negligence, recklessness, and departures from the applicable standards of care by Defendant and its agents and/or employees as noted above, Decedent suffered severe and ultimately fatal injuries, and his statutory beneficiary has been caused to suffer the loss of his society and companionship, wounded feelings, mental shock and suffering, grief and sorrow, loss of the comfort and society of the

Decedent, pecuniary loss, and other damages recoverable under the South Carolina Wrongful Death Act.

97.    Plaintiff, as Personal Representative, is entitled to recover from Defendant a sum of money to compensate the statutory beneficiary for all damages allowable under the wrongful-death action, in an amount to be determined by the Court at trial.

### FOR A SECOND CAUSE OF ACTION
**(Survival)**

98.    Plaintiff hereby incorporates by reference and re-alleges every allegation in every Paragraph of this Complaint as if fully set forth herein.

99.    As a direct and proximate result of the negligence, carelessness, gross negligence, recklessness, and departures from the applicable standards of care by Defendant and its agents and/or employees as noted above, Decedent suffered severe and debilitating injuries that caused his death.

100.    Prior to his death, and for a period of approximately four minutes and thirty-eight seconds of documented, conscious distress, Mr. Wilks experienced extreme conscious pain, suffering, air hunger, terror, and mental anguish while being asphyxiated as a result of the conduct of Defendant's agents and/or employees.

101.    The intensity of this suffering is qualitatively distinct from, and substantially greater than, the suffering associated with chronic or less acute conditions, and represents one of the most extreme forms of suffering a human being can experience.

102.    Additionally, Decedent's estate incurred expenses, including funeral and burial expenses.

103.    Plaintiff, as Personal Representative, is entitled to recover from Defendant a sum of money to compensate Decedent's estate for all damages allowable under the survival action, in an amount to be determined by the Court at trial.

### FOR A THIRD CAUSE OF ACTION
**(General/Ordinary Negligence)**

104.    Plaintiff hereby incorporates by reference and re-alleges every allegation in every Paragraph of this Complaint as if fully set forth herein.

105.    Defendant and its agents and/or employees undertook the duty to render care to Decedent in accordance with the prevailing standards in the national community.

106.    The USA had the duty to provide staff adequately trained and able to provide routine, ministerial, supervisory, and non-medical care to its residents, and had the right and power to direct and control the manner in which its employees and agents provided that care and operated the Dorn CLC.

107.     As the South Carolina Supreme Court has recognized, "[n]ot every action taken by a medical professional in a hospital or doctor's office necessarily implicates medical malpractice and, consequently, the requirements of [S.C. Code Ann.] Section 15-79-125." Dawkins v. Union Hosp. Dist., 408 S.C. 171, 178, 758 S.E.2d 501, 504 (2014).

108.     "[A]t all times, the medical professional must exercise ordinary and reasonable care to ensure that no unnecessary harm befalls the patient," and "medical providers are still subject to claims sounding in ordinary negligence." Id.

109.     The supervision, dietary, staffing, monitoring, and emergency-response failures alleged herein constitute breaches of ordinary, routine, ministerial, administrative, and non-medical duties of care, which are not subject to the statutory damages limitation applicable to medical-malpractice claims.

110.     Notwithstanding said undertaking, and while Decedent was under Defendant's care, Defendant and its agents and/or employees departed from prevailing and acceptable standards of routine, ministerial, administrative, supervisory, and non-medical care and were thereby negligent, careless, grossly negligent, and reckless, and are liable for one or more of the following acts of omission or commission:

a.     In failing to and act upon Mr. Wilks's known choking risk and ensure he had proper food and supervision;

b.     In acting or failing to act in a manner appropriate to any reasonable person charged with the supervision of a dependent, wheelchair-bound resident;

c.     In failing to render proper routine, ministerial, administrative, and non-medical care, including basic meal supervision;

d.     In failing to properly stock lifesaving antichoking devices which can be had on Amazon for less than $25.00 (wall hanging lifevac choking rescue device);

e.     In failing to staff the facility appropriately to ensure ordered supervision;

f.     In serving a contraindicated food in violation of a prescribed therapeutic diet;

g.     In failing to summon emergency assistance (911) and to render basic, non-medical first aid upon the onset of choking;

h.     In failing to properly train and supervise its staff in meal supervision, therapeutic-diet compliance, and emergency response;

i.     In failing to have proper policies, procedures, rules, regulations or guidelines to prevent the type of harm that befell Mr. Wilks;

j.     In continuing to employ and deploy staff when Defendant knew or should have known that doing so would result in harm to residents such as Mr. Wilks; and

k.      In such other particulars as may be ascertained through discovery.

111.    As a direct and proximate result of Defendant's negligence, carelessness, gross negligence, recklessness, and departures from proper routine, ministerial, administrative, supervisory, and non-medical care, Decedent suffered conscious pain and suffering and death, Decedent's estate incurred expenses, and Decedent's statutory beneficiary suffered the damages described above. Plaintiff, as Personal Representative, is entitled to recover from Defendant a sum of money to compensate the estate and the statutory beneficiary for all damages allowable under the survival and wrongful-death actions, in an amount to be determined by the Court at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant United States of America for actual and consequential damages in an amount to be determined by the Court at trial (not to exceed the sum certain stated in Plaintiff's administrative claim, as required by 28 U.S.C. § 2675(b)), together with the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

**MCGOWAN, HOOD, FELDER & PHILLIPS, LLC**

s/ S. Randall Hood
S. Randall Hood, Federal ID No. 6103
Nash Parham, Federal ID No. 13680
1539 Health Care Drive
Rock Hill, South Carolina 29732
(803) 327-7800 (phone)
rhood@mcgowanhood.com
nparham@mcgowanhood.com

*Attorneys for Plaintiff*

Rock Hill, South Carolina

July 7, 2026

13